# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01482-COA

**THE SAXON GROUP INC.**                                        **APPELLANT**

**v.**

**SOUTH MISSISSIPPI ELECTRIC POWER**                       **APPELLEE**
**ASSOCIATION**

DATE OF JUDGMENT:                09/21/2017
TRIAL JUDGE:                     HON. ROBERT B. HELFRICH
COURT FROM WHICH APPEALED:       FORREST COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:         CLYDE X. COPELAND
                                 JASON EDWIN WEEKS
ATTORNEYS FOR APPELLEE:          MARK EDWARD NORTON
                                 LAWRENCE CARY GUNN JR.
NATURE OF THE CASE:              CIVIL - CONTRACT
DISPOSITION:                     AFFIRMED - 09/03/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1.     Southern Mississippi Electric Power Association (SMEPA) contracted with a Georgia

construction company named Saxon Group Inc. (Saxon), to provide mechanical and electrical

construction services.  In violation of the construction contract, Saxon defaulted on payments

to its subcontractors and suppliers, forcing Hanover Insurance Company (Hanover), Saxon's

surety, to assume Saxon's posture as payor. Saxon sued SMEPA in Forrest County Circuit

Court, seeking contract reformation and alleging several claims for breach of contract.

¶2.     On SMEPA's motion, the circuit court granted partial summary judgment on Saxon's

claim for interest owed for monies remitted to Hanover. At the conclusion of Saxon's case in chief, SMEPA moved for a directed verdict on Saxon's consequential damages claim. The court denied the motion. The jury found Saxon was entitled to recovery on all of its remaining claims. SMEPA then filed a motion for a judgment notwithstanding the verdict, which the court granted. Saxon's $1.2 million verdict and corresponding claim for consequential damages were set aside. Aggrieved, Saxon now appeals. After reviewing the record, we affirm the circuit court's judgments.

## FACTS & PROCEDURAL HISTORY

¶3.    SMEPA, now known as Cooperative Energy, is a South Mississippi electric cooperative headquartered in Hattiesburg, Mississippi.[1] Saxon was a Georgia heavy-industrial construction company owned by Jeni Bogdan. On or about August 9, 2010, Saxon received a "Request for Quotation" from the engineering firm, Burns McDonnell; the request solicited bids for the opportunity to act as general contractor over SMEPA's Moselle Repower Project (Project. No. 49302) ("Moselle Project").[2] The Moselle Project sought to upgrade and modernize SMEPA's Moselle, Mississippi Power Station. Saxon, one of five invited contractors, submitted bids for the mechanical and electrical construction contracts associated with the project. By submitting the lowest bid, two percent lower than Yates

---

[1] After 75 years of doing business as "Southern Mississippi Electric Power Association," the company changed its name to "Cooperative Energy" on November 9, 2016.

[2] Burns McDonnell is a full-service engineering firm; they provided engineering and construction oversight for the Moselle project.

2

Construction, Saxon was awarded both contracts.

¶4. Consistent with industry custom, Saxon was compelled to obtain a surety bond as a prerequisite to securing the construction contract. The bond, obtained from Hanover, guaranteed indemnity for SMEPA in the event Saxon failed to meet its obligations under the Moselle contract. To acquire Hanover as its surety, Saxon signed an unqualified indemnity agreement, assigning all of its rights under the SMEPA contract to Hanover in the event of a default. The agreement further provided that, if necessary, Hanover would be responsible for fulfillment of Saxon's unrealized contractual obligations.

¶5. As the project proceeded, Saxon indeed fell behind on payments to its subcontractors and suppliers. On or about July 2012, SMEPA was contacted by several subcontractors and made aware of the defaults. SMEPA ceased paying Saxon based on the terms of the construction contract, which provided that Saxon "within five (5) days after receipt of any payment from [SMEPA]" would pay all of its material suppliers and subcontractors. As a penalty for violating the provision, the contract stated that "[n]o payment shall be due while [Saxon] is in default" and allowed SMEPA to withhold payment based on Saxon's "failure to perform." In August 2012, Saxon sent correspondence acknowledging the delinquent accounts and assuring SMEPA that they were on track to bring them current pending the resolution of some disputed invoice amounts the subcontractors and suppliers submitted. Saxon demobilized from the work site in September 2012; the accounts were still past due. A subsequent investigation into the defaulted payments revealed Saxon was, in fact, upside

3

down on the contractual obligations and ultimately prompted SMEPA to contact Saxon's surety, Hanover, in October 2012.[3]

¶6.    In March 2013, Hanover issued a "freeze funds" letter, demanding that SMEPA submit the final contract payments to Hanover instead of Saxon, citing their indemnity agreement. The surety paid all of the aggrieved vendors, disbursing a total of $3,017,455.04; the final payment Hanover received from SMEPA was only $2,690,721.79. SMEPA agreed that a significant delay of about two years occurred before Hanover was paid the remainder owed on the contract. No clear explanation was provided for the delay, but there were several factors cited in the record, namely Saxon's failure to submit the required forms and the ongoing litigation of the current case. After receiving a valid Certificate of Completion on April 8, 2015, SMEPA submitted the final payment amount to Hanover on May 26, 2015.[4] Saxon maintains the money was improperly withheld and faults SMEPA's delayed payment for its downfall. Unable to maintain as an independent company, Saxon agreed to an acquisition of its assets by Primoris Services Corporation in 2012.

¶7.    Saxon filed a complaint on February 14, 2014, blaming SMEPA for the "ruination of

---

[3] SMEPA contacted individual subcontractors and found that they were owed more than Saxon indicated. The delinquency totals were significantly more than the total contract with SMEPA was worth. Even if SMEPA paid out the entire amount due on the contract, Saxon would not have been able to cover the delinquencies. Hanover was contacted to pay the aggrieved suppliers and subcontractors.

[4] The final payment submitted by SMEPA to Hanover was deficient by $326,733.25 compared to the settlement payments Hanover made to fulfill SMEPA's outstanding debts to suppliers and subcontractors.

4

the company." The complaint sought equitable reformation of the parties' mechanical construction contract, damages for bad faith breach of contract and wrongful withholding of amounts due related to the mechanical contract and a separate electrical contract. SMEPA denied the allegations and filed a motion for partial summary judgment on May 29, 2015. The court denied the motion in an order entered January 19, 2016.

¶8.    Together, the parties reached a partial settlement on the wrongful withholding claim and subsequently dismissed the reformation claim voluntarily. Despite the previous denial, on August 12, 2016, SMEPA filed another pre-trial motion for final summary judgment on Saxon's remaining claims that:

(1)    SMEPA improperly withheld $250,000 as liquidated damages;

(2)    SMEPA wrongfully back charged Saxon in the amount of $93,326.39 for incomplete work;

(3)    SMEPA owes Saxon interest on monies paid to Hanover;

(4)    Saxon is entitled to consequential damages.

On December 19, 2016, the court entered an order granting partial summary judgment on Saxon's claim for contractual interest on monies paid to its surety; the parties proceeded to trial on the three remaining issues.

¶9.    At the conclusion of Saxon's case, SMEPA motioned the court for a directed verdict. The motion was denied and a jury verdict, including consequential damages of $1.2 million, was awarded to Saxon. SMEPA responded with a motion for judgment notwithstanding the verdict on Saxon's consequential damages claim, which the court granted. Aggrieved, Saxon

5

appeals the grant of partial summary judgment and the judgment notwithstanding the verdict.

## STANDARDS OF REVIEW

¶10. This Court employs a de novo standard of review when a party appeals the grant or denial of summary judgment. *Waltman v. Engineering Plus Inc.*, 26 So. 3d 758, 760 (¶7) (Miss. 2019) (citing *Bullock v. Life Ins. Co. of Miss.*, 872 So. 2d 658, 660 (¶6) (Miss. 2004)). The Court "examines all the evidentiary matters before it – admissions in pleadings, answers to interrogatories, depositions, affidavits . . . [and] the evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Chapel Hill LLC v. SoilTech Consultants Inc.*, 112 So. 3d 1097, 1099 (¶9) (Miss. Ct. App. 2013).

¶11. Likewise, the Court applies a de novo standard when reviewing a judgment notwithstanding the verdict. The court must determine whether the trial court "properly found that the jury's verdict was not supported by a legally sufficient evidentiary basis." *White v. Stewman*, 932 So. 2d 27, 36 (¶25) (Miss. 2006). Furthermore, we must consider the evidence in the light most favorable to the non-movant, giving him the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Id.* (citing *Steele v. Inn of Vicksburg Inc.*, 697 So. 2d 373, 376 (Miss. 1997)). If, after viewing the evidence in this manner, we conclude that reasonable men could only have found in favor of the movant, we must reverse and render. *Id.* Conversely, if we find substantial evidence to support the verdict (i.e., "evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions") then we must

affirm the jury's verdict. *Id.*

## DISCUSSION

### I. Summary Judgment on Contractual Interest Claim

¶12. SMEPA asserts no contractual interest payments are owed to Saxon because (1) Saxon assigned any and all payment rights to its surety, Hanover, and (2) all payments by SMEPA were remitted by the due date outlined in the contract. Saxon, however, contends the monies for interest are due, and despite the assignment, should be paid to their company to prevent SMEPA from receiving a windfall. Saxon holds SMEPA accountable for the payment defaults that ultimately triggered the assignment to Hanover. The circuit court granted summary judgment on Saxon's claim for interest, reasoning that Saxon had assigned all of its rights, including any interest due on delayed payments, to Hanover. We agree.

¶13. Saxon argues the indemnity agreement with Hanover provides a reversionary right to sue SMEPA for funds owed under their original contract and allows bifurcation of the Moselle contract payment rights; Hanover gained rights to the principal, while Saxon maintained the rights to the alleged interest due. We find no evidence in the record to support Saxon's contention. "The general rule in Mississippi is that the right to receive money due or to become due under an existing contract may be assigned." *So. Miss. Planning and Dev. Dist. v. Alfa Gen. Ins. Corp.*, 790 So. 2d 818, 820 (¶12) (Miss. 2001) (citing *Great S. Nat'l Bank v. McCullough Envtl. Servs. Inc.*, 595 So. 2d 1282, 1286 (Miss. 1992)). In *Ford v. White*, 495 So. 2d 494 (Miss. 1986), the Court held that the "assignee

7

must acquire all [the] rights, interests and remedies available to the assignor." To secure bonding, Saxon executed an expansive indemnity agreement, in which "*all* monies retained, due, or due in the future on account of any contract . . . in which any or all of the indemnitors have an interest . . . " were assigned to Hanover as its surety for the Moselle Project contract. (Emphasis added). There is no mention of limited assignment. The agreement provided the assignment would go into effect if Saxon "delay[ed], default[ed] . . . or breach[ed] any contract secured by [the] bond, or fail[ed], neglect[ed], or refuse[d] in any manner to timely pay for any labor or material used in the prosecution of any contracts secured by [the] bond."

¶14.    Neither party disputes the payment defaults to subcontractors and suppliers or the fact that Hanover stepped into Saxon's place to bring the accounts current. "[P]robably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed" and this is "known as the right of subrogation." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37 (1962). "Subrogation is the substitution of one person in place of another, whether as creditor or as the possessor of any rightful claim." *St. Paul Prop. & Liab. Ins. Co. v. Nance*, 577 So. 2d 1238, 1241 (Miss. 1991). We find that Saxon indeed defaulted and, as subrogee, Hanover rightfully assumed rights to the Moselle contract in toto.

¶15.    The circuit court correctly found no genuine issue of material fact with regard to any interest payments due. Any rights or payments owed to Saxon, as outlined in the original agreement, were assigned to Hanover upon default to the subcontractors and suppliers. Now

8

absent privity, Saxon cannot enforce the contract terms against SMEPA and lacks standing to pursue the current claim on Hanover's behalf. Therefore, it is unnecessary to address payment timeliness. Accordingly, we affirm the grant of summary judgment.

## II. Judgment Notwithstanding the Verdict

¶16. Saxon also contends that the circuit court erred in granting SMEPA's Motion for Judgment Notwithstanding the Verdict. As the "reviewing court," we are "concerned with what the contracting parties have said to each other" and "the objective fact – the language of the contract." *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.* 857 So. 2d 748, 752 (¶9) (Miss. 2003) (citing *Turner v. Terry*, 799 So. 2d 25, 32 (Miss. 2001)); *Osborne v. Bullins*, 549 So. 2d 1337, 1339 (Miss. 1989). Courts should "seek the legal purpose and intent of the parties from an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence." *Royer*, 857 So. 2d at 752 (¶9). The construction contract signed by both parties includes a waiver of consequential damages and reads:

> Section 4. Wavier of Consequential Damages: Neither party shall be responsible to the other for, or held liable for, consequential damages, including, without limitation, damages in the nature of loss of use of existing property, loss of profits, loss of contract, loss of product or business interruption.

The jury was instructed to find in favor of SMEPA if "[the above] paragraph was agreed to by both parties . . . ."[5] Saxon argues the jury correctly found that it did not "agree" with the waiver of damages clause in the contract. However, Saxon's owner, Jeni Bogdan testified

---

[5] Jury Instruction D-9 contained the instruction.

to the contrary at trial.

SMEPA Attorney: Both parties to this contract gave up the right to sue each other for consequential damages; did they not?

Bogdan: Yes, sir.

SMEPA Attorney: If this power plant had been held up for an inordinate amount of time, SMEPA would not have had the right to sue Saxon for loss of use of the existing property, loss of profits, loss of contract, or loss of product or business interruption; isn't that correct?

Bogdan: Yes, but they would have had the option . . . to have the work done should Saxon have defaulted on any of that.

SMEPA Attorney: But the point is SMEPA gave up the right to sue your company for consequential damages under this clause?

Bogdan: That is how it reads, yes, sir.

SMEPA Attorney: And your company also gave up the right to sue SMEPA for consequential damages under this clause; didn't it?

Bogdan: Yes, sir, we did.

¶17.　Additionally, Saxon cites four exceptions to the enforcement of a no-damage-for-delay clause set forth in *Mississippi Transportation Commission v. SCI Inc.*, 717 So. 2d 332, 338 (¶26) (Miss. 1998) (holding that despite a no-damage-for-delay clause, damages may be recovered when the delay (1) was not contemplated by the parties; (2) resulted from fraud; (3) extended an unreasonable length of time such that the contract could be justifiably abandoned; or (4) was not named as one of the delays listed within the clause). SMEPA conceded that such clauses can be likened to the waiver of consequential damages at issue

10

here. But, Saxon failed to introduce, request, or object to the exclusion of a jury instruction on the *SCI* exceptions at the circuit court. Therefore, Saxon cannot raise them now. Saxon asserts the instructions given to the jury were erroneous without the *SCI* exceptions, but their argument is ill-reasoned and without merit. Failure to request or propose a plausibly favorable jury instruction rests with Saxon, not the circuit court or SMEPA. In fact, the record indicates that a jury instruction on the *SCI* exceptions was mistakenly submitted by SMEPA for consideration, and ultimately dismissed *voluntarily* by Saxon's trial counsel. Saxon may not now argue that the "instruction was erroneous for a reason other than the reason assigned on objection to the instruction at trial." *Young v. Robinson*, 538 So. 2d 781, 783 (Miss. 1989). No such objection was made to the proposed and accepted D-9 jury instruction. Given the instructions submitted to the jury, the circuit court correctly granted the judgment notwithstanding the verdict.

## CONCLUSION

¶18.　We find no genuine issue of material fact existed with regard to Saxon's claim for interest on monies paid by SMEPA to Hanover and affirm the grant of summary judgment. Additionally, the trial court correctly concluded that Saxon was precluded from seeking consequential damages; thus the judgment notwithstanding the verdict was properly granted.

¶19.　**AFFIRMED.**

　　　**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. C. WILSON, J., NOT PARTICIPATING.**